MEEHAN v. ADIRONDACK ELECTRIC POWER CORPORATION.

(Supreme Court, Trial Term, Saratoga County. December, 1914.)

1. ELECTRICITY (§ 19*)—INJURIES INCIDENT TO PRODUCTION AND USE—NEGLIGENCE.

An electric power company placed, at the direction of village authorities, a pole in a street seven inches from a wall separating school grounds from the street. Attached to the pole was a gooseneck, through which a live wire ran. The top of the wall was 18 inches wide and 6 feet above the ground at the pole. Boys were accustomed to use the wall and pole as places for play, and the company had knowledge thereof. The wire where it entered the gooseneck was defective, and had so remained for at least a week or ten days. A boy, while at play, came in contact with the wire and was killed by electric shock. *Held* that, since it was the duty of the company to maintain its wires in a safe condition where boys might come in contact with them, the question of its negligence was for the jury.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 11; Dec. Dig. § 19.*]

2. DEATH (§ 99*)—ACTION FOR DEATH—VERDICT—EXCESSIVE VERDICT.

A boy about 10 years old was killed by electric shock. He was healthy and energetic. He attended school, but after school worked and received $2 a week, and something more during summer. He also had a Sunday paper route. He turned over his money to his mother. *Held*, that a verdict for $5,000 was not excessive.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. § 99.*]

Action by Peter Meehan as administrator of Vincent Meehan, deceased, against the Adirondack Electric Power Corporation. Motion to set aside verdict for plaintiff denied.

Leary & Fullerton, of Saratoga Springs, for plaintiff.
Edgar T. Brackett, of Saratoga Springs, for defendant.

WHITMYER, J. Vincent Meehan, a bright, active boy, 10 years 8 months of age and nearly 5 feet tall, was killed in the village of Saratoga Springs, N. Y., on May 6, 1913, at about 7:30 p. m., by a current of electricity from or through a gooseneck, attached to an electric light pole, belonging to defendant. He had grasped the gooseneck, preparatory to sliding down the pole. This stood in a street or public alley of the village and was used by defendant to support its wires in its business of furnishing electricity for light, heat, and power. It stood 7 inches away from the wall, which separates the high school grounds, in said village, from the said street or alley, and was placed there under the direction of the street and water board of the village. It was 8 inches in diameter and smooth. The gooseneck attached to it was on the side of it away from the wall. That was 16 feet above the level of the alley, 10 feet above the level of the school grounds, and 3 feet 9 inches above the top of the wall. A wire ran through it. The wire carried a current of 2,000 or 2,300 volts, and fed an incandescent lamp at the end of the gooseneck.

Intestate and three other boys had been playing ball on the school grounds on the night in question. At the end or during the course

of the game three of the boys, intestate's older brother, 14 years old, intestate, and Joubert, 11 years old, climbed up on the wall, for the purpose of playing "tag" or "follow the leader." Rowland, the fourth boy, did not go up. He went to the alley. The boys went up at a point 150 feet easterly from the pole in question, where there was a gate. At this point the top of the wall was 5 feet 3 inches above the ground. At the pole it was 6 feet above the ground. The post of the gate was 22½ inches square, and attached to it were hinges, which were used by the boys in climbing up. The top was 18 inches wide and had a tin covering, with cone-shaped nubs over the anchor bolts, which had been flattened from use. When they reached the top, they ran toward the pole in the order named. Intestate's brother reached it first. He put his arms around it and slid to the ground. He did not touch the gooseneck and did not receive any shock. Intestate came next. According to Rowland, who was in the alley, he put his right arm around the pole and grasped the gooseneck with his left hand. In this position, and while his feet were still on the wall, he received a shock and fell to the ground dead. Rowland says that the lights went down when he grasped the gooseneck. Joubert says that he saw sparks coming out of his hands. Dr. Towne says that there was a scar on his right hand near the palm. He also says that an examination, made immediately after the accident, showed that the wires were bare. Owen, an electrician, examined the gooseneck a day or two later, and found that the wire was uninsulated, was "rather bad," where it entered the gooseneck; Hays, seven or eight days before that, had observed that the wire "fluttered" where it entered the hood; and Hopkins, about ten days before, had seen a flash at the same place.

[1] This evidence was practically undisputed. In addition, it appeared, from plaintiff's case, that boys ranging from 10 to 15 years of age had been and were accustomed daily, both during and after school hours, to use the wall and the pole in question in their games of "tag" and "follow the leader," by climbing the wall, running along it toward the pole, and sliding down the pole in the same way. Rohan, defendant's superintendent, who had lived in the neighborhood for 10 years, testified that he never saw this. On this evidence the jury found for plaintiff in the sum of $5,000, and also found specifically, among other things: (1) That boys, prior and down to the time of the accident, were accustomed to use the wall and the said pole as places for play; (2) that defendant was reasonably chargeable with knowledge of such custom; and (3) that defendant, in the exercise of reasonable care, should have anticipated that boys might use the wall and the pole as places for play. The evidence was ample to sustain these findings, but defendant claims, even so, that intestate was either a trespasser or at best a licensee, and that its only duty to him was to abstain from inflicting intentional or wanton or willful injury upon him, and that there is no evidence of that, so that the complaint should be dismissed. In Braun v. Buffalo G. E. Co., 200 N. Y. 484, 492, 94 N. E. 206, 209 [35 L. R. A. (N. S.) 1089, 140 Am. St. Rep. 645, 21 Ann. Cas. 370] the court said:

"The fundamental and general principle that a company like respondent, if reasonably chargeable with knowledge, or in the exercise of reasonable prudence bound to anticipate, that people may lawfully come in close proximity to its wires either for purposes of business or pleasure, is under obligation to exercise care to keep the latter in a safe condition is abundantly established."

The intestate in that case was killed, while engaged as a carpenter in the erection of a building on private premises in the city of Buffalo, by taking hold of two wires strung and maintained by defendant across said premises and carrying an electric current of high voltage. It was decided that it was a question for the jury whether the company ought not, in the exercise of reasonable care and foresight, to have apprehended that the lot, over which the wires were strung, might be so used as to bring people in contact with them.

In Daltry v. Media Electric L., H. & P. Co., 208 Pa. 403, 57 Atl. 833, the defendant was held liable for injuries from a defectively insulated wire, which was strung across a private lawn, and which came in contact with plaintiff, a boy 10 years old, who had passed from the street onto the lawn to play. The court said:

"Having constructed the line across the lawn to the house in proximity to the carriageway, it knew that children as well as adults might frequent the way, and hence the necessity for keeping its wires in a proper condition and repair to avoid danger. It must be presumed that the company also knew what the evidence disclosed as a fact that children used the lawn of the premises near the gateway and in the vicinity of the wire, as well as the street in front of the premises, as a playground. * * * It was therefore the duty of the company * * * to take reasonable precautions to prevent injury to persons who might be at this point."

In Temple v. McComb City El. Light & Power Co., Supreme Court of Mississippi, 89 Miss. 1, 42 South. 874, 11 L. R. A. (N. S.) 449, 119 Am. St. Rep. 698, 10 Ann. Cas. 924, a demurrer was overruled to a complaint in which it was in substance stated that the plaintiff, a boy 10 years old, had been injured by coming in contact with a live wire strung by defendant through a tree with branches reaching nearly to the ground in a thickly populated neighborhood, and in which plaintiff and other children played. In holding that the bill stated a cause of action, the court did so, not on the ground that the defendant actually knew of the habit of the plaintiff and other children, but on the ground that:

"It did know the tree, the kind of tree, and, knowing that, knew what any person of practical common sense would know—that it was just the kind of a tree that children might climb into to play in the branches."

In Caruso v. Troy Gas Co., 153 App. Div. 431, 138 N. Y. Supp. 279, affirmed 209 N. Y. 510, 102 N. E. 1100, an action to recover for the death of a boy, about 18 years of age, killed by electricity from wires entering a temporary structure, 7 or 8 feet in height and about 12½ feet in length, built upon the sidewalk of a street in the city of Troy, while attempting to climb upon same to see a parade, it was held that an order setting aside a verdict for $1,500 for plaintiff, should be reversed, and the verdict reinstated. The structure was built by defendant for use in furnishing an electrical display during a celebration in the city. Defendant installed two converters, carry-

ing 2,300 volts, in the structure. The wires were brought into the building by the contractor for the Chamber of Commerce of the city, and defendant connected them with the converters and furnished the electricity. When erected, a sign marked "Danger—2300 volts" was upon the building. A policeman, who arrived at the scene of the accident immediately after the accident, did not see this when he arrived. Plaintiff's intestate and two other boys were out in the evening seeing the parade. They saw this building from the other side of the street, ran over to it, and attempted to climb up on the roof. Plaintiff's intestate found a tin can, stood upon it, and, in trying to climb up, grabbed the wires, which entered the building, and received the shock which caused his death. The court said:

"The improper wiring alone did not cause the death. It was caused by a combination of circumstances. The defendant built a low structure upon the street for use during the celebration; its height was such that boys might naturally desire to climb upon it to view the parade. The wires entered the building in an improper manner, and without proper protection, and with entire disregard to the safety of others. The defendant brought into the building a current of 2,300 volts of electricity to its converters, which were reduced to 110 volts. Before connecting the wires with its converters, and putting in use the building which it had erected, and supplying its current, the defendant owed some duty to the public to see that the situation about the building and the converters was reasonably safe, and by a violation of that duty it conducted its business in a negligent manner and thus brought about the intestate's death."

In the case at bar defendant placed the pole in question in a street or public alley, 7 inches from the wall which separated the school grounds from said street or alley. While it was placed where it was under the direction of the street and water board of the village, that fact did not warrant defendant in stringing or maintaining its wires thereon in such a manner as to endanger the public. Caruso v. Troy Gas Co., supra. The top of the wall was 18 inches wide. It had been covered with cone-shaped nubs, but these had become flattened from use of the wall by boys. The top was 6 feet above the ground at the pole, and 5 feet 3 inches at the gate. It was not difficult to climb, especially not for boys about 5 feet in height, as intestate was. Its height was such that boys might naturally desire to climb upon it and to run along it. The pole in question was 8 inches in diameter and smooth. It was only 7 inches from the wall. It was such a pole and in such a position that boys might naturally desire to slide down it in their play. Whether there were other poles between this one and the gate, by which the boys frequently climbed upon the wall, does not appear. The gooseneck was on the side of the pole away from the wall and only 3 feet 9 inches above the top of the wall. It could be reached easily. Running along the wall to the pole, nothing would be more natural than for boys to take hold of the gooseneck and slide down the pole. Defendant was reasonably bound to anticipate this in locating its pole, and therefore to keep the wires strung thereon in a safe condition.

Not only that, but there is evidence, and the jury have found, that boys did actually use the wall and the pole in their games of "tag" and "follow the leader," and that defendant had or was chargeable

with knowledge of the practice. Under these circumstances, defendant was bound to do more than merely to abstain from inflicting intentional, or wanton, or willful, injury. And there is evidence, also, that the wire was defective, where it entered the gooseneck, and that it had been so for at least a week or ten days, so that defendant, if it did not have actual knowledge of the condition, was chargeable with knowledge of it. The case, for these reasons, was one for the jury.

Hickok v. Auburn Light, Heat & Power Co., 200 N. Y. 464, 93 N. E. 1113, and Heskell v. Same, 209 N. Y. 86, 102 N. E. 540, cited by defendant, are distinguishable. The intestate in the Hickok Case was a deputy sheriff of the county of Cayuga. He ascended a pole, which was in the middle of the courtyard of the county, to replace a bulb. The pole belonged to the defendant. The sheriff received a shock from a defective wire, which was strung on the pole, and was killed. He was not called upon or authorized to climb into the place of danger, and it was held that he was a volunteer, if not a trespasser, to whom the defendant owed no duty. In that case the court said:

"A very different situation would have been presented if, by defendant's negligence in placing these wires, or by a lack of care in maintaining them, the pole had become pervaded with electricity so near the ground as to injure the decedent while engaged in the lawful use of the courtyard."

The intestate in the Heskell Case was an employé of the Auburn Telephone Company, two of whose wires were fixed to the top of one of defendant's poles, located in a street. They were fixed without any express arrangement or agreement between the companies or specific consent on the part of defendant, although defendant knew about it for a long time prior to the accident and passively acquiesced in this location. Intestate was sent up on the pole at the time of the accident to remedy a reported defective condition of the telephone wires, and while doing so came in contact with a defective wire belonging to the defendant, and was killed. It was held that he was only a licensee, and that defendant owed him only the duty of abstaining from inflicting upon him intentional, or wanton, or willful injury, and that there was no evidence of this. Those cases might have been applicable here, if intestate had been obliged to climb and had climbed up the pole from the street. As the case is, the pole was near to, and could be and was easily reached from, the wall. The pole and the wall were used as places for play. Under these circumstances, it was the duty of defendant to maintain its wires in a safe condition where boys might come in contact with them from the wall, just as much as it was where they might come in contact with them from the street.

[2] The jury have found a verdict for $5,000. Intestate was 10 years 8 months old at the time of his death. He was bright, healthy, strong, and energetic. He attended school. After school, he worked. He went on errands, and at times acted as a watchman. He received $2 a week for this, and something more during the summer. He also had a Sunday paper route. He turned his money over to his mother. Under these circumstances, it cannot be said that the ver-

dirt is excessive.  At any rate, it is not so excessive that this court is warranted in substituting its judgment for that of the jury.

The motion is therefore denied.